# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-307 (CJN)** |
| **v.** | : | |
| | : | |
| **SUSAN MANWARING,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Susan Manwaring ("Manwaring") to 14 days of incarceration as a condition of 36 months of probation, pursuant to 18 U.S.C. § 3563(b)(10)—or alternatively a split sentence of 14 days of incarceration followed by 36 months of probation, pursuant to 18 U.S.C. § 3561(a)(3) followed by 36 months of probation—as well as $500 restitution, and the mandatory $25 special assessment.

## I.        Introduction

Defendant Susan Manwaring, a 59-year-old resident of Vernal, Utah, and her son, Landon Manwaring ("L.M."),[1] participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College

---

[1] Separately charged in *United States v. L.M.*, 1:22-cr-270 (CJN), and sentenced by this Court on November 28, 2022, to 30 days of incarceration followed by 35 months of probation, with $500 restitution.

1

vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[2]

Defendant Manwaring pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G) (Unlawful Parading, Demonstrating, or Picketing in the Capitol Building). As explained herein, a sentence of 14 days of incarceration as a condition of 36 months of probation, pursuant to 18 U.S.C. § 3563(b)(10)—or alternatively a split sentence of 14 days of incarceration followed by 36 months of probation, pursuant to 18 U.S.C. § 3561(a)(3) followed by 36 months of probation—as well as $500 restitution, and the mandatory $25 special assessment, is appropriate in this case because Manwaring (1) entered the Capitol through the Senate Wing Door while other rioters were entering the building through smashed out windows adjacent to that door; (2) was inside the Crypt when a mob of rioters stormed past police officers and into further reaches of the Capitol; (3) walked to the vicinity of Speaker Pelosi's office suite, an area that would have been closed to the public even when the Capitol building was open to the public; (4) remained inside the Capitol for approximately half an hour; (5) repeatedly minimized her conduct during two interviews with the FBI, falsely claiming that police did nothing to discourage or prevent rioters from entering the Capitol building and that she saw no property destruction when she entered; and (6) has yet to express remorse for her criminal conduct on January 6.

The Court must also consider that Manwaring's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers

---

[2] Although the Statement of Offense in this matter, filed on August 26, 2022, (ECF No. 7 at ¶ 3) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol as of October 17, 2022, was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the facts of and circumstances of Manwaring's crime and her attempts to minimize and excuse her conduct both times the FBI interviewed her support a sentence of 14 days of incarceration as a condition of 36 months of probation, pursuant to 18 U.S.C. § 3563(b)(10)—or alternatively a split sentence of 14 days of incarceration followed by 36 months of probation, pursuant to 18 U.S.C. § 3561(a)(3) followed by 36 months of probation—as well as $500 restitution, and the mandatory $25 special assessment.

## II.        Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 9 (Statement of Offense), at 1-3.

### *Defendant Manwaring's Role in the January 6, 2021, Attack on the Capitol*

In early January 2021, Manwaring and her son, L.M., traveled together from Vernal, Utah, to Washington, D.C. to attend rallies in support of former President Donald Trump. On January 5, 2021, Manwaring and L.M. attended a rally where they were informed by the speakers and fellow rally-goers that the plan for the next day, January 6, 2021, was for people to attend former President Trump's rally on January 6, 2021, and, after former President Trump's speech ended, then march to the U.S. Capitol to attempt to influence the Senate while it tallied the votes of the Electoral College.

On January 6, 2021, Manwaring and L.M. attended former President Trump's rally and then marched to the U.S. Capitol as planned. As she approached the U.S. Capitol building from the west, Manwaring saw metal bicycle rack barricades that had been pushed aside.

Manwaring and L.M. joined the mob that proceeded *en masse* to the U.S. Capitol's west plaza, where rioters were inside a restricted area and physically battling police amidst clouds of tear gas. Manwaring and L.M. watched, filmed video, and took pictures of the chaos using their mobile telephones. The photographs below show Manwaring and L.M., circled in yellow, within the mob on the west plaza.





Eventually, Manwaring and L.M. followed the mob up the exterior stairs to the U.S. Capitol building's second level, known as the Upper West Terrace.

At approximately 2:13 p.m., rioters used a stolen police riot shield and other objects to smash the windows on either side of the Capitol building's Senate Wing Doors. With the windows shattered, rioters breached the Capitol building for the first time by jumping through the window over the broken glass:



At approximately 2:23 p.m.—just ten minutes after the entry depicted above—Manwaring and L.M. entered the U.S. Capitol building through the same Senate Wing Door.[3] At the time Manwaring and L.M. entered the U.S. Capitol building, an alarm was sounding, other rioters were climbing into the building through broken windows on either side of the Senate Wing Door, and at least one of the windows of the Senate Wing Door itself was broken. The moment the Manwarings entered the Capitol is depicted below, with the Manwarings circled in yellow.

---

[3] Manwaring and L.M. claimed that police officers were waving people in at this breach/entry point at this time, but the government has identified no evidence supporting this claim.



Over the next thirty minutes, Manwaring and L.M. walked throughout the U.S. Capitol building. Along the way, Manwaring saw broken windows, observed multiple uniformed and armed police officers, posed for photographs, and took photographs of other rioters.

Immediately after entering the Capitol building, Manwaring and L.M. turned to the right and walked past the shattered glass on the floor from the smashed-in window. As they walked down that hallway, Manwaring took a photograph of L.M. in which L.M. appears on the far-left side of the frame, with his face turned toward the camera.



Manwaring and L.M. proceeded from the Senate Wing Door to the Crypt, where they encountered a mass of other rioters, who were stymied by a few police officers blocking the nearby stairs to access the Capitol's second floor. The Manwarings appear in the photographs below, circled in red in the first photograph and yellow in the second.





Manwaring used her cell phone to photograph the scene inside the Crypt.



Shortly thereafter, the mass of rioters surged forward and overwhelmed the small group of officers guarding the stairway, which was near the Memorial Doors. Approximately two minutes after the other rioters breached that police line, Manwaring and L.M. joined the avalanche of rioters that streamed through that area and up the stairs, as pictured below with the Manwarings circled in red.



Once up the stairs, Manwaring and L.M. walked through Statuary Hall, as captured below with the Manwarings circled in red. L.M. used his cell phone to photograph the scene.



From Statuary Hall, Manwaring and L.M. walked to the area outside of Speaker of the House Nancy Pelosi's office, which Manwaring photographed. L.M. appears below, circled in yellow. The United States does not have surveillance camera footage of either Manwaring or L.M. inside Speaker Pelosi's office suite, however.



From Speaker Pelosi's office suite threshold, Manwaring and L.M. walked to the Rotunda, where they spent approximately ten minutes.



Manwaring and L.M. then exited the Rotunda and walked down the old Supreme Court chamber stairs, returning to the Capitol's first floor, as pictured below with the Manwarings circled in red.



Manwaring and L.M. finally exited the Capitol building at 2:53:47 p.m. through the Senate Wing Door, the same door through which they had entered thirty minutes earlier. The photograph below depicts the moment Manwaring and L.M. exited, with them circled in red.



Manwaring and L.M. were aware that the Senate intended to tally the Electoral College votes, and thus certify the 2020 presidential election of Joseph R. Biden, on January 6, 2021, the same day that they entered and participated in the occupation of the Capitol building.

In total, Manwaring and L.M. spent 30 minutes inside of the Capitol. Both Manwaring and L.M. have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and they engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*Manwaring's First Interview with the FBI*

On August 11, 2021, just over a year before she was charged in this case, Manwaring gave a voluntary interview to the FBI. Manwaring admitted traveling to Washington with her son, L.M., on January 5, 2021, and entering the Capitol building on January 6, 2021. Manwaring consistently minimized her conduct, however. She claimed that she never saw violence from the police or any protestors and that the scene on the ground was nothing like the violence and rioting portrayed on

the news. (Manwaring's account is contradicted by copious video footage.) Manwaring stated that she did not feel that she did anything wrong.

According to Manwaring, when she and L.M. entered the Capitol building, they did so without any deterrents. She asserted that while police were present and obviously armed, they did nothing to keep protestors away from or out of the building; people were freely moving in and out of the Capitol. She claimed she did not see any broken doors or windows and that no alarms were going off. Manwaring also stated that she did not go to the Capitol to disrupt the electoral vote but rather just to peacefully make her presence known (presumably to lawmakers) and that she only went inside the building because she wanted to see it. She stated she and L.M. left when the Capitol began getting crowded and she felt the mood shift, not because any police officer told them to exit.

Manwaring admitted taking multiple photographs while inside the Capitol building. She stated that she uploaded the photos to her desktop computer, deleted them from her phone, and did not post them on social media. Manwaring refused to allow investigators to view the photos.

*Manwaring's Second Interview with the FBI*

A little over three months later, on August 22, 2021, Manwaring consented to a second voluntary interview with FBI agents. Manwaring mostly reiterated her earlier statements. Manwaring again minimized her conduct and suggested police permitted her, L.M., and others to enter and exit the Capitol. This time, however, Manwaring acknowledged that as she and L.M. approached the Capitol on foot after the rally, they saw bicycle rack barricades that had been pushed aside. She admitted that she asked L.M. if he wanted to climb the stairs to access the Capitol's Upper West Terrace and go inside the Capitol building. Finally, she conceded that when she reviewed her photographs, she noticed that there were broken windows around the door she and L.M. used to enter the Capitol building.

Manwaring admitted roaming the Capitol, including the area outside of Speaker Pelosi's office suite and the Rotunda. She estimated that she and L.M. spent 20 minutes inside the Capitol and stated they chose to leave when the building became more crowded with protestors who appeared to be acting increasingly aggressive. (In reality, the Manwarings spent 30 minutes inside the Capitol building.)

At the conclusion of the second interview, Manwaring signed a consent form and allowed law enforcement officers to view and make copies of the photographs and videos she took while inside the Capitol building. Manwaring did not express remorse or regret about her actions on January 6, 2021.

<div align="center"><em>The Charges and Plea Agreement</em></div>

On September 13, 2022, the United States charged Manwaring by a one-count information with violating 40 U.S.C. § 5104(e)(2)(G). Manwaring was never formally arrested. On October 4, 2022, the Court held a hearing in which Manwaring both had her initial appearance and pleaded guilty to the Information pursuant to a plea agreement. *See* ECF Nos. 5-7. The Court granted Manwaring release pending her sentencing. By plea agreement, Manwaring agreed to pay $500 in restitution to the Department of the Treasury.

**III.     Statutory Penalties**

Manwaring now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Manwaring faces up to six months of imprisonment and a fine of up to $5,000. Manwaring must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.         Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days of incarceration as a condition of 36 months of probation, pursuant to 18 U.S.C. § 3563(b)(10)—or alternatively a split sentence of 14 days of incarceration followed by 36 months of probation, pursuant to 18 U.S.C. § 3561(a)(3) followed by 36 months of probation—as well $500 restitution, and the mandatory $25 special assessment.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Manwaring's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Manwaring, the absence of violent or destructive acts is not a mitigating factor. Had Manwaring engaged in such conduct, she would have faced additional criminal charges.

14

One of the most important factors in Manwaring's case is the fact that she entered the Capitol building through the Senate Wing Door just ten minutes after it was first breached, making her part of the initial wave of rioters that quickly overwhelmed police officers and provided the rioters with nearly unfettered access to the Capitol's chambers, offices, hallways, and other sensitive areas. While Manwaring was not wearing tactical gear herself, nor did she engage in violence, the true strength of the rioters was in the mob's sheer numbers, and she added to that power.

The volume of rioters in the Crypt is what caused police officers to yield at one of the riot's first—and most important—interior chokepoints: the area just outside the Memorial Doors, where officers made a brief stand in an attempt to keep rioters from accessing the nearby staircase, which led to the Speaker's Lobby. Once rioters broke this line, they—including Manwaring and her son—progressed up those same stairs. The area they were then able to access allowed rioters to access Speaker Pelosi's office suite. Inside, some of the Speaker's staff members were hiding in terror under a conference table. See https://www.businessinsider.com/pelosi-staff-barricaded-themselves-in-room-as-rioters-looted-office-2021-1. Some of the rioters who entered Speaker Pelosi's office[4] suite stole items, including a government laptop computer used by Speaker Pelosi. Others overturned her furniture, left threatening messages, and defecated. An avalanche is comprised of individual snowflakes. Without the mass of rioters, including Manwaring, all confronting them at once, the police may have been able to hold their position near the Memorial Doors and keep the rioters far more contained, and clear them from the Capitol building far sooner.

---

[4] The government acknowledges that the Manwarings do not appear to have entered the interior of any of Speaker Pelosi's office suite spaces.

Additionally, Manwaring has failed to express genuine remorse, or even accept full responsibility for her actions. Instead, during both of her FBI interviews she minimized her conduct at every turn, claimed that police did nothing to indicate that she and other rioters were not allowed inside the Capitol building, and insisted that she did not see the broken glass, notice the rioters climbing through windows, or hear the blaring alarms as she entered. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence beyond mere probation.

### B. The History and Characteristics of Manwaring

Prior to her conduct on January 6, 2021, Manwaring appears to have led a productive, law-abiding life. She has no criminal history. PSR §§ 23-28, 41. For approximately ten years, she ran a small business producing orthodontic equipment. *Id.* § 44. In February 2022, she sold the business to her son, L.M., who now runs it from his home. *Id.*

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

### Specific Deterrence

Manwaring's actions – before and during the riot – demonstrate the need for specific deterrence. According to Manwaring's FBI interviews, she entered the Capitol without thinking critically about her actions; she just followed the crowd. The Court must sentence her in a way that inhibits her from acting like a lemming again in the future. Moreover, Manwaring demonstrated no real recognition of wrongdoing until she pled guilty and accepted responsibility. Indeed, during her FBI interviews, she repeatedly sought to minimize or excuse her criminal conduct. Manwaring's resistance to acknowledging the full scope of his conduct demonstrates some need for specific deterrence. If she persists in believing that she and other rioters were allowed to enter the Capitol, it would increase the risk that she would offend again. That said, the government is not aware of other evidence that Manwaring poses an ongoing risk, such as social media messages celebrating the riot.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Manwaring based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Manwaring has pleaded guilty to Count One of the Information, charging her with Unlawful Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a)

factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent.

Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this Court has sentenced other defendants convicted of petty offenses to incarceration. The sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The most direct comparison for Manwaring's conduct is the case against her son L.M., 1:22-cr-270 (CJN), who engaged in essentially identical conduct inside and outside the U.S. Capitol building and similarly minimized his conduct in his interview with federal agents. This Court sentenced L.M. to 30 days of incarceration followed by 35 months of probation. Manwaring should not receive the same sentence as L.M., however, because between January 6, 2021, and his sentencing, L.M. committed a new felony in his home state of Utah, for which he was separately prosecuted by the state. *See* L.M. ECF No. 16. At sentencing, this Court made clear that it was concerned by L.M.'s continued criminal conduct, which justified a stiffer penalty to effect specific deterrence. Manwaring has no such additional criminal conduct or other aggravating factor, however, and thus she should receive a lesser sentence than her son.

*United States v. Seymour, et. al.*, 1:22-cr-41 (APM), involved a similar family dynamic. The defendant, Seymour, Sr., was a 61 year-old man with no criminal record who unlawfully entered the Capitol building alongside his adult son, Seymour, Jr., who was charged as a co-defendant. Like the Manwarings, the Seymour father and son duo approached the Capitol from the

west, witnessed mob confrontations with police on the West Plaza, entered the building through the Senate Wing Doors (albeit approximately 45 minutes after the Manwarings), took and posed for photographs inside, and exited after spending approximately 25-30 minutes inside the building. The Court sentenced both Seymour, Sr. and Seymour, Jr. to 12 months of probation. The main differences between Seymour, Sr. and Manwaring is that the former immediately acknowledged the wrongfulness of his actions and accepted responsibility, whereas Manwaring did not; Manwaring spent approximately five minutes longer in the Capitol building, and Manwaring reached a more sensitive area (Speaker Pelosi's suite).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**V.       A sentence of probation may include imprisonment as a condition of probation.**

A sentencing court may impose imprisonment as a condition of probation under 18 U.S.C. § 3563(b)(10).   Under Section 3563(b)(10), the Court may impose an imprisonment term in distinct intervals, with each interval not exceeding two weeks.   Second, a sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," Foster v.

Wainwright, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—under 18 U.S.C. § 3561(a)(3).  See United States v. Little, 590 F.Supp.3d 340, 351 (D.D.C. 2022) (explaining that a sentence of 60 days of imprisonment followed by three years of probation is permissible under Section 3561(a)(3) for a defendant convicted of a single petty offense).

In this case, a sentence of 14 days of imprisonment and 36 months of probation is sufficient, but not greater than necessary, to serve the purposes of sentencing under 18 U.S.C. § 3553(a)(2).  The Court may impose such a sentence either under Section 3563(b)(10), with a term of imprisonment as a condition of probation, or as a split sentence under Section 3561(a)(3).

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  Id.  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  Id.[6]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation.  18 U.S.C. § 3653(b)(10).  Section 3563(b)(10)

---

[6] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation. *Id.* Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation. *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10). Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10). *See Anderson*, 787 F. Supp. at 539. Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals)

and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation).   Imposing an intermittent confinement sentence with 14 days of imprisonment as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[7]

## VI.      A sentence imposed for a petty offense may include both imprisonment and probation.

The government's recommended sentence of 14 days in prison and 36 months of probation is also permissible under 18 U.S.C. § 3561(a)(3).  As Judge Lamberth observed, Section 3561(a)(3)

---

[7] *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Nov. 21, 2022).

"permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses." *Little*, 590 F.Supp.3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).  Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[8]

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 14 days of incarceration followed by 36 months of probation, as well as $500 restitution, and the mandatory $25 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:        */s/ Michael M. Gordon*
<div style="margin-left:40%">

MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney, Detailee
United States Attorney's Office
For the District of Columbia
Telephone No. (813) 274-6370
michael.gordon3@usdoj.gov

</div>

---

[8] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.

## CERTIFICATE OF SERVICE

On January 10, 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ Michael M. Gordon
MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney, Detailee
United States Attorney's Office
For the District of Columbia
Telephone No. (813) 274-6370
michael.gordon3@usdoj.gov